IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

STUART WRIGHT,                           )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )        Case No. 10-01220-CV-W-SWH
                                         )
UNITED STATES OF AMERICA, et al.,        )
                                         )
                    Defendants.          )

ORDER

        Pending before the Court is the Motion of the Individual Capacity Defendants to Dismiss

Count IV of Plaintiff's First Amended Complaint or, in the Alternative, for Summary Judgment (doc

#49).[1]  First, defendants argue that any claims other than "an unreasonable search and seizure, an

illegal and unconstitutional use of excessive force and also a deprivation of liberty without due

process [false arrest]" must be dismissed for failing to state a claim upon which relief may be

granted as these are the only claims that are supported by sufficient factual allegations.  (Id. at 10)

Next, defendants John Clark, the former Director of the U.S. Marshals Service, and Walter Bradley,

the U.S. Marshal for the District of Kansas, argue that they must be dismissed because there is no

respondeat superior liability under Bivens[2] and because Clark and Bradley had no direct

_____

        [1]In response, plaintiff filed Plaintiff's Suggestions in Opposition to Motion of the
Individual Capacity Defendants to Dismiss Count IV of Plaintiff's First Amended Complaint or,
in the Alternative, for Summary Judgment [Doc. #49] and Plaintiff's Alternative Motion to (a)
overrule and deny the Motion without prejudice, or (b) defer considering the Motion, or (c)
allow time for discovery, or (d) issue any other appropriate order (doc #56).

        [2]In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388
(1971), "the Supreme Court created a private right of action for damages against federal officers
alleged to have violated an individual's constitutional rights.  Such actions are identical to

participation in the incident at issue. (Motion ... to Dismiss Count IV ... (doc #49) at 12) Finally, defendant Deputy Marshals Sean Franklin and Christopher Wallace argue that they are entitled to summary judgment on the claims of false arrest, improper search and seizure and excessive force. (Id. at 15-25)

## I. THE COMPLAINT

Count IV of the First Amended Complaint provides in part:

### Count IV – Bivens Claims

\* \* \*

58.     The Bivens claims are not made against defendants United States, Hylton, Bradley, Franklin and Wallace in their official capacities.

59.     Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 ... (1971) provided liability in factual situations which do exist herein:

- "... damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials ...."

- "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests and liberty."

- "'... where legal rights have been invaded, ... federal courts may use any available remedy to make good the wrong done.'"

- "[P]etitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts."

- "... petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the [Fourth]

_____

actions under 42 U.S.C. § 1983, except for the replacement with a federal actor under Bivens for a state actor under § 1983." Panagacos v. Towery, 782 F.Supp.2d 1183, 1189 (W.D. Wash. 2011).

2

Amendment."

60.   The actions and omissions of defendants denied plaintiff his rights under the Fourth Amendment, Fifth Amendment, Eighth Amendment and Fourteenth Amendment (due process and equal protection) to the United States Constitution, all as set forth throughout this document.

* * *

(First Amended Complaint (doc #38) at 25-26)

## II.   DISCUSSION

The Court will first discuss the dismissal arguments relating to supervisory liability brought by defendants Clark and Bradley and then the arguments seeking summary judgment on the claims for false arrest, improper search and seizure and excessive force brought by defendants Franklin and Wallace.

A.   Dismissal

When ruling on a motion to dismiss, "the court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party."  Coons v. Mineta, 410 F.3d 1036, 1039 (8th Cir. 2005)(citation omitted).  In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court issued the following standard to apply when considering motions to dismiss:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

Id. at 555 (internal citations and quotations omitted).  The plaintiff must plead a claim that moves "across the line from conceivable to plausible."  Id. at 570.  "[T]he tenet that a court must accept as

3

true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)(citing <u>Twombly</u>, 550 U.S. at 555).

As set forth above, defendants claim that all theories of tort liability set out in Count IV of the First Amended Complaint other than "an unreasonable search and seizure, an illegal and unconstitutional use of excessive force and also a deprivation of liberty without due process [false arrest]" are barred in that there are insufficient factual allegations to support any additional constitutional claims. (Motion ... to Dismiss Count IV ... (doc #49) at 10) Further, defendants Clark and Bradley argue that they must be dismissed because there is no respondeat superior liability under <u>Bivens</u> and because Clark and Bradley had no direct participation in the incident at issue. (<u>Id.</u> at 12)

Plaintiff responds that he does not rely upon simple respondeat superior against defendants Clark and Bradley, but rather upon multiple allegations regarding issues such as supervision and training in paragraphs 15, 16, 17,[3] all of which refer in detail to matters including "Government

---

[3]Paragraphs 15, 16 and 17 of the First Amended Complaint, which are incorporated into Count IV, provide in part:

15. <u>Defendants' Responsibilities</u>

At all times pertinent to this Complaint, defendants USA, Clark, and Bradley had responsibility for the United States Marshals Service as well as for the deputies who are employed by that agency in the District of Kansas. Furthermore, the individual defendants had respective responsibility for performing functions as supervisors and/or duly sworn law enforcement officers.

16. <u>Law Enforcement Management</u>

At all times pertinent to this Complaint, defendants USA, Clark, and Bradley had the full responsibility for managing the United States Marshals Service and its agents,

4

and more specifically for hiring, promoting, training, supervising, disciplining, and firing employees of said Service in the District of Kansas.

      17.     Bases of Liability, Including Government Custom and Government Deliberate Indifference as to Hiring, Promotions, Training, Supervision, Discipline, and Termination

All of the actions and/or omissions of defendants took place pursuant to, and acting upon, the policies, practices, procedures, patterns, decisions, instructions, orders, and customs of defendant USA and all defendants. Plaintiff alleges that defendants are liable for damages caused by defendants' intentional and/or wrongful and/or reckless and/or negligent acts/omissions while the individual defendants were acting within the course and scope of their employment. This all took place under circumstances where defendant USA and individual officers are liable. Defendants' liability is based upon allegations including the following things, all of which demonstrate patterns of behavior and deliberate indifference to the issues raised and to the rights of citizens and particularly the rights of plaintiff Stuart Wright.

* * *

(e)     Inadequate provision, implementation, and execution of the authority and obligation to hire, promote, train, supervise, discipline, and terminate personnel;

(f)     Improper implementation and execution of law enforcement powers, arrest warrant processing, arrest powers, and the use of force;

* * *

(h)     Acquiescence in, and/or ratification of, the actions and omissions described throughout this pleading;

* * *

(j)     Failure to avoid abusive treatment and excessive force used upon citizens (including plaintiff), and (thereafter) failure to investigate abusive treatment and excessive force used upon citizens (including plaintiff);

(k)     Failure to take remedial action against a known pattern of misconduct by officers;

5

Custom and Government Deliberate Indifference as to Hiring, Promotions, Training, Supervision, Discipline, and Termination." (Plaintiff's Suggestions in Opposition ... (doc #56) at 22-23) Therefore, plaintiff argues that his claims consist of inadequate hiring, promotions, training, supervision, discipline and termination, in addition to unreasonable search and seizure, excessive force and false arrest.

Defendants are correct in arguing, and plaintiff does not appear to disagree, that supervisory officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Therefore, plaintiff Wright

---

(l)     Failure to take significant steps to prevent a known risk of wrongful arrest, assault/battery, and excessive force on citizens (including plaintiff);

\* \* \*

(n)     Tolerance of misconduct regarding physical abuse and excessive force toward citizens;

(o)     Deliberate indifference and conscious disregard for a high risk that the officers would use excessive force and/or fail to protect against such use in violation of citizens' federally and state protected rights (particularly here as relates to plaintiff Stuart Wright);

\* \* \*

These all constituted, and/or led to, deprivations of rights, privileges, and immunities secured by the federal and state constitutions as well as federal and state laws, including but not limited to violations of plaintiff's rights under the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution. The said actions, omissions, policies, practices, procedures, patterns, decisions, instructions, orders, and customs of defendants were the moving forces behind the constitutional and other violations described in this pleading. Those things are established, in part, by proof of knowledge and/or acquiescence and/or ratification. Defendants acted together in a joint venture, were joint tortfeasors, and are jointly and severally liable to plaintiff.

(First Amended Complaint (doc #38) at 8-11)

does not base his claims against defendants Clark and Bradley on respondeat superior, but instead on allegations involving inadequate hiring, promotions, training, supervision, discipline and termination. However, while the First Amended Complaint contains these general allegations, the factual bases for such allegations are not provided.

As set forth in <u>Coley v. Baca</u>,[4] 2012 WL 1340373 (C.D. Cal. Mar. 8, 2012), lack of factual support in the complaint is cause for dismissal as "'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.' <u>Iqbal</u>, 129 S.Ct. at 1949. '[M]ere conclusory statements[ ] do not suffice.' <u>Iqbal</u>, 129 S.Ct. at 1949 (citing <u>Twombly</u>, 550 U.S. at 555)." The <u>Coley</u> case provides:

> ... [S]upervisory officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. ... Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." <u>Iqbal</u>, 129 S.Ct. at 1948. ... A supervisor may be held "individually liable in § 1983 suits when culpable action, or inaction, is directly attributed to them." <u>Starr [v. Baca]</u>,[5] 652 F.3d [1202], 1206 [9th Cir. 2011]. To be

---

[4]The <u>Coley</u> case highlights both facts sufficient to withstand a motion to dismiss (with respect to Los Angeles County Sheriff Baca) as well as allegations which are insufficient to withstand a motion to dismiss (with respect to the Los Angeles County Board of Supervisors and individual supervisors). 2012 WL 1340373 at *6-7.

[5]In the <u>Starr</u> case, plaintiff Starr, an inmate of the Los Angeles County Jail, brought a claim of supervisory liability for deliberate indifference against Los Angeles County Sheriff Baca. The Ninth Circuit held that "Starr's allegations that the actions or inactions of the person 'answerable for the prisoner's safe-keeping' caused his injury are therefore sufficient to state a claim of supervisory liability for deliberate indifference." <u>Coley</u>, 2012 WL 1340373 at *5 (quoting <u>Starr</u>, 652 F.3d at 1208). Plaintiff Starr had alleged that:

> (1) in September 1997, Baca received an investigative report from the United States Department of Justice ("DOJ") of a continued and serious pattern and practice of constitutional violations including abuse of inmates by his deputies and inmate on inmate violence; (2) Baca received weekly reports from subordinates of death and injuries in the jails, as well as reports of his Special Counsel and the Office of Independent Review; (3)

7

held liable, the supervisor need not be "physically present when the injury occurred," nor "'directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury.' Rather, the supervisor's participation could include his 'own culpable action or inaction in the training, supervision, or control of his subordinates,' 'his acquiescence in the constitutional deprivations of which the complaint is made,' or 'conduct that showed a reckless or callous indifference to the rights of others.'" Starr, 652 F.3d at 1205-06 ....

2012 WL 1340373 at *4.

The court found that plaintiff Coley had alleged sufficient facts to withstand a motion to

dismiss by Los Angeles County Sheriff Baca as follows:

... Like the plaintiff in Starr, plaintiff alleges that he was the victim of an unwarranted physical attack by a deputy that resulted in a serious physical injury. In Starr, the alleged incident of deputy-on-inmate violence occurred in January 2006. In this case, the alleged incident occurred in October 2007, approximately twenty months later. Like the plaintiff in Starr, plaintiff alleges that Baca received reports form the DOJ and the Special Counsel of "a continuing and serious pattern and practice of constitutional violations, including abuse of inmates by deputes," as well as "notice of increasing levels of inmate violence, lax security and discipline, and other serious defects in Sheriff's Department practices and procedures. ..." [FAC 6]. See Starr, 652 F.3d at 1209-12. ...

Plaintiff's first amended complaint contains facts plausibly suggesting that Baca is "liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." See Starr, 652 F.3d at 1208-09 (emphasis in original). Therefore, Baca's motion to dismiss the first amended complaint should be denied.

_____

in 1999, Baca signed a document indicating he was aware of problems identified by the DOJ, but "after years of monitoring the County Jail system ... in 2006 the DOJ experts issued a report which still found noncompliance with many of its recommendations regarding the abuse of inmates ..."; (4) Baca was aware of specific incidents, described in the complaint, of attacks on inmates by deputies and deaths during each of the four years preceding the attack on the plaintiff in 2006; and (5) in 2004 and 2005, Baca received reports of increasing levels of inmate violence, lax security and discipline, and other serious defects in Sheriff's Department practices and procedures form the Special Counsel to the Los Angeles County Sheriff's Department.

Coley, 2012 WL 1340373 at *5 (citing Starr, 652 F.3d at 1209-12).

8

<u>Coley</u>, 2012 WL 1340373 at *6.  The court went on to find that plaintiff Coley had failed to allege sufficient facts[6] to withstand a motion to dismiss by the Los Angeles County Board of Supervisors and individual supervisors as follows:

> Unlike his allegations against Baca, which contain specific facts plausibly suggesting deliberate indifference, plaintiff's allegations against the Board of Supervisors and individual supervisors are no more than "raw legal conclusions with insufficient facts to support them."  <u>Starr</u>, 652 F.3d at 1208.  Plaintiff does not identify any policy or custom of the Board of Supervisors that caused a violation of his rights.  He alleges no facts plausibly suggesting that the Board of Supervisors or individual supervisors knew or should have known of the specific unlawful conditions of confinement that plaintiff alleges posed a substantial risk of serious harm.  He does not allege the nature of the "deliberate conduct" by the Board of Supervisors or how it caused the violation of plaintiff's rights.

> A plaintiff must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  <u>Twombly</u>, 550 U.S. at 555 (internal citations and footnote omitted).  Plaintiff's allegations against the Board of Supervisors and its members are formulaic and do not rise above the speculative level.  Accordingly, plaintiff's claims against the Board of Supervisors and individual supervisors should be dismissed.

<u>Coley</u>, 2012 WL 1340373 at *7.

In <u>Aguilar v. Immigration and Customs Enforcement Division of the United States Department of Homeland Security</u>, 811 F.Supp.2d 803, 806 (S.D.N.Y. 2011), the plaintiffs, individuals whose homes were searched by agents of the Immigration and Customs Enforcement Division of the Department of Homeland Security ("ICE"), brought suit against various entities and

---

[6]Plaintiff Coley alleged that:  "(1) a policy or custom of the Board of Supervisors caused the alleged violation of his rights; (2) defendants had a 'statutory duty to report abuse and take corrective action yet failed to do so'; (3) defendants knew that mentally ill inmates in particular faced a substantial risk of serious harm if jail officials failed to take steps to protect them; and (4) deliberate conduct by the Board of Supervisors was the moving force behind the violation of plaintiff's rights."  <u>Coley</u>, 2012 WL 1340373 at *6.

9

individuals including Michael Chertoff, the former Secretary of the Department of Homeland Security and Julie Myers, the former Assistant Secretary of ICE. The court dismissed the claims against Chertoff and Myers stating:

> In support of their Fourth Amendment claims against defendants Chertoff and Myers, the plaintiffs make a number of allegations that are either conclusory or unsupportably vague. They allege that defendant Chertoff was the "ultimate decision maker" for the Department of Homeland Security ("DHS"), including ICE; that he "created, approved, and implemented official policies and strategies," including the Secure Border Initiative, the comprehensive immigration policy for the United States; and that as the Secretary of DHS, he was "involved in the planning and/or investigation of ICE agents' conduct during raids." Compl. ¶ 73. They allege, moreover, that both defendants Chertoff and Myers "intended to violate constitutional rights by ... implementing [ICE] policies," Compl. ¶¶ 73, 80, and "encouraged, endorsed, and thus intended the unconstitutional conduct by ICE during home raids," Compl. ¶¶ 75, 80, 81. These allegations are similar to the conclusory allegations found insufficient in Iqbal, and under Iqbal, they are not entitled to any weight.

Aguilar, 811 F.Supp.2d at 816.

Here, plaintiff Wright has alleged no specific nonconclusory facts sufficient to raise a claim of inadequate hiring, promotions, training, supervision, discipline or termination. Therefore, plaintiff Wright's claims for supervisory liability against defendants Clark and Bradley in Count IV of the First Amended Complaint must be dismissed.

B.     <u>Summary Judgment</u>

With the dismissal of the claims for supervisory liability against defendants Clark and Bradley, the claims remaining in Count IV of the First Amended Complaint consist of unreasonable search and seizure, excessive force and false arrest against defendants Franklin and Wallace. Defendants Franklin and Wallace contend that summary judgment[7] must be entered on these <u>Bivens</u>

---

[7]Pursuant to Federal Rule of Civil Procedure 56, summary judgment is granted when the pleadings and evidence show that there is no genuine issue of material fact and the moving party

claims asserted against them because they are protected by qualified immunity. Specifically, defendants argue:

> Franklin and Wallace are ... entitled to qualified immunity in this case. Although Wright's First Amended Complaint does not identify any particular actions taken by Franklin and Wallace, it is conceded that Franklin and Wallace had direct participation in the activities that form the basis of Wright's <u>Bivens</u> claims. Nonetheless, Franklin and Wallace are entitled to qualified immunity because the actions undertaken by them on April 15, 2009, did not violate Wright's constitutional rights – the first requirement that Wright must establish to avoid the application of qualified immunity.

(Motion ... to Dismiss Count IV ... (doc #49) at 15)

Both plaintiff and defendants agree that the proper test used to determine whether the doctrine of qualified immunity applies was set forth by the Eighth Circuit Court of Appeals in <u>Howard v. Kansas City Police Department</u>, 570 F.3d 984 (8th Cir. 2009). (<u>See</u> Motion ... to Dismiss Count IV ... (doc #49) at 11; Plaintiff's Suggestions in Opposition to Motion ... to Dismiss Count IV ... (doc #56) at 19) The <u>Howard</u> court wrote:

> "Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." ... To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.

<u>Howard</u>, 570 F.3d at 987-88 (citations omitted). <u>Accord</u> <u>Baribeau v. City of Minneapolis</u>, 596 F.3d

---

is entitled to judgment as a matter of law. The burden is on the moving party to show the absence of evidence to support the nonmoving party's case. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). The nonmoving party may not rest upon allegations or general denials, but must come forward with specific facts to prove that a genuine issue for trial exists. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). The Court must review the facts in the light most favorable to the party opposing the motion for summary judgment and give that party the benefit of any inferences that logically can be drawn from those facts. <u>See</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970).

11

465, 473-74 (8th Cir. 2010).

Defendants Franklin and Wallace advise that they are only arguing that the facts do not demonstrate the deprivation of a constitutional right. They are not arguing that the right was not clearly established at the time of the alleged deprivation. (<u>See</u> Motion ... to Dismiss Count IV ... (doc #49) at 11 n.3) Defendants organized their summary judgment argument into three sub-categories: (1) false arrest; (2) improper search and seizure; and (3) excessive force. (<u>Id.</u> at 15-25) The Court will address the claims of false arrest along with improper search and seizure and then the claim of excessive force.

### 1.    False Arrest/Improper Search and Seizure

According to defendants, defendant Franklin properly arrested and detained plaintiff Wright for resisting arrest as "Franklin had sufficient grounds to arrest Wright after he refused to comply with a directive to get down on the ground, when Wright evaded Franklin by backing away, and when Wright threatened to use physical violence against Franklin." (Motion ... to Dismiss Count IV ... (doc #49) at 15) Therefore, there was no constitutional violation by defendant Franklin. (<u>Id.</u>) In the alternative, defendants argue that "Franklin's actions in arresting Wright based on mistaken identity ... did not violate the Constitution" under the Supreme Court decision in <u>Hill v. California</u>, 401 U.S. 797 (1971). (<u>Id.</u> at 16) Next, defendants argue "[i]nasmuch as Wright's arrest was constitutional, [the] post-arrest conduct [of handcuffing Wright, taking him outside the gym, checking his identification, running a search for outstanding warrants and then releasing Wright from custody after approximately 15 to 20 minutes] likewise did not violate the Fourth Amendment." (<u>Id.</u> at 20) Finally, as for defendant Wallace, defendants assert "Wallace did not arrest Wright and, thus, is entitled to qualified immunity on any false arrest constitutional claim

12

because he did not directly participate in the alleged violation." (<u>Id.</u> at 16 n.5)  Defendants repeat this argument with respect to plaintiff's claim of improper search and seizure as to defendant Wallace.  (<u>Id.</u> at 20 n.7)

First, the premise underlying defendants' argument with respect to defendant Wallace is simply wrong.  As set forth by the Missouri Supreme Court, "all persons who directly procure, aid, abet, or assist in an unlawful imprisonment are liable as principals."  <u>Rustici v. Weidemeyer</u>, 673 S.W.2d 762, 768 (Mo. 1984)(quoting <u>Parrish v. Herron</u>, 225 S.W.2d 391, 399 (Mo. Ct. App. 1949)).  As set forth in the Declaration of Christopher Wallace, Wallace participated in the arrest team and deployed his taser, bringing plaintiff Wright to the ground where Wright was then handcuffed.  (<u>See</u> Ex. B to Motion ... to Dismiss Count IV ... (doc #49-2) at ¶¶ 4, 18 and 19)  The Court finds that defendant Wallace aided, abetted and assisted in the arrest/search and seizure of plaintiff.  Contrary to defendants' argument, defendant Wallace directly participated in the alleged violation.

The "facts"[8] which form the core of defendants' argument that defendant Franklin had

---

[8]Defendants set forth the following in support of their argument that plaintiff was resisting arrest:

25.     Franklin drew his service weapon and began yelling "Police–U.S. Marshal, get on the ground Vinol."  The man refused to get down and kept backing away from Franklin.  Franklin kept yelling and the man said "I'm not the one you want."  Franklin again yelled for the man to get down, but he kept backing away.  Franklin reached out with his arm and tried to grab the man, but he pushed Franklin's arm away, took a stance, and cocked his arm like he was about to throw a punch at Franklin.  Franklin Declaration ¶ 29; Wallace Declaration ¶¶ 15-16.

* * *

31.     After pushing away Franklin's arm, the man in the "23" jersey cocked his arm to a fighting position.  Franklin Declaration ¶ 30; Wallace Declaration ¶ 12.

32.     Wallace, at that point standing behind the player, was concerned that the

sufficient grounds to arrest plaintiff (regardless of the mistaken identity) are anything but

undisputed. Plaintiff Wright has provided the following evidence which creates a genuine issue of

material fact for trial as to whether Wright was, as argued by defendants, resisting arrest:

Declaration of Stuart Wright:

2.    On April 15, 2009, I was playing basketball with 9 other
people in a full-court game at the Grandview Community Center in
Grandview, Jackson County, Missouri.

3.    Very suddenly, a man wearing a Kansas City Royals shirt
came rushing toward me holding a gun in his right hand pointed at me. I did
not see where he originally came from. The first thing I saw was him being
directly in front of me, rushing toward me with the gun pulled and out in his
right hand and pointed at me.

4.    The man was not wearing a uniform of any type that I was
able to recognize. I mainly remember his wearing a Kansas City Royals
shirt. I did not see anything identifying him as a law enforcement officer.

5.    The man was yelling things as he came toward me, but I could
not understand what he was saying.

6.    He just kept advancing toward me.

7.    At some point, I do remember hearing the name Vinol
mentioned and my saying that my name is Stuart Wright and that I had
identification there in the gym.

8.    I remember the man in the Royals shirt [defendant Franklin]
grabbing my shirt and kicking at my legs.

9.    I never threatened him by any words I said or anything I did.

10.   I never cocked my fist in any way at all or did anything else
at all that looked like I was going to punch him. I had seen the gun pointed

---

man was disobeying direct orders to get on the ground and appeared to be preparing to
strike Franklin. Wallace Declaration ¶ 17.

(Motion ... to Dismiss Count IV ... (doc #49) at 5 and 7)

in my direction, and I was very scared about all of that.

> 11.     I made no indication that I would try to hurt or injure him in any way.

> 12.     I never challenged or provoked him in any way.

> 13.     I did not use or threaten the use of violence or physical force on anyone.  I did not flee.  I never tried to run away from the man in any way.

(doc #33-1)

Declaration of Brandon Rashad Jones:

> 3.     I remember seeing a man in a Kansas City Royals jersey running at my teammate Stuart Wright.  The man had a gun in his right hand, and the gun was pointed at Stuart.

> 4.     I did not see anything indicating that the man was a law enforcement officer.

> 5.     I did not see Stuart Wright threaten the man in any way.

> 6.     Stuart did back up a few steps when the man with the gun kept coming toward him.  However, Stuart never ran away from him.

> 7.     Stuart did not draw back his fist in any way at all or try to knock away the man's hand.

(doc #33-2)

Declaration of Stephen Leonard Wright:

> 2.     On April 15, 2009, I was sitting on the sidelines of the game being played in the Grandview Community Center in Grandview, Jackson County, Missouri.

> 3.     Very suddenly, a man wearing a Kansas City Royals shirt came rushing toward my brother, Stuart Wright, holding a gun in his right hand pointed at Stuart.

> 4.     The man was not wearing a uniform of any type that I was able to recognize.  I did not see anything identifying him as a law

15

enforcement officer.

      5.      I never saw Stuart threaten the man by anything he said or did.

      6.      Stuart did not run away from the man. All I saw was Stuart backing up a few steps from the man with the gun as the man continued to go toward Stuart.

      7.      I never saw Stuart cock his fist in any way at all or try to knock away the man's hand.

(doc #33-3)

Declaration of Walter Kenneth Bethea:

      3.      [O]n April 15, 2009, I saw ... men rush onto the basketball court in the middle of a game that we were playing.

      4.      It all happened very fast. One of the men ran toward Stuart Wright with a gun in his right hand pointed at Stuart. Stuart did back up a few steps as the man continued to run at him. However, I never saw or heard Stuart do anything threatening toward the man in any way. Stuart did not seek to run away from the man. I did not see Stuart cock his fist in any way or push the man away from him in any way.

(doc #33-4)

Defendants' argument that "Franklin's actions in arresting Wright based on mistaken identity ... did not violate the Constitution" under the Supreme Court decision in <u>Hill v. California</u>, 401 U.S. 797 (1971), must also fail. The <u>Hill</u> case was not a civil case brought by the victim of a mistaken identity arrest, but was instead a suppression issue brought by the criminal defendant when his apartment was searched and evidence was seized after the arrest of a person who matched the defendant's physical description and who was found in the defendant's apartment. The <u>Hill</u> court found that the officers reasonably believed the person they arrested was defendant Hill, the person for whom they had probable cause to arrest, and that the actions the officers took after the arrest were, likewise, reasonable. <u>Id.</u> at 803-05. Some courts, as cited by defendants, have expanded the

16

analysis in <u>Hill</u> to include civil suits for mistaken identity.  In these cases, the issue to be decided

was whether a reasonable officer could have believed that the plaintiff was the person named in the

warrant.  See <u>Moore v. McMullen</u>, 1998 WL 416105, *1 (9th Cir. June 17, 1998)("In addition, the

officer must prove that he exercised due diligence to ascertain that the right person is being

arrested."); <u>Sumpter v. United States</u>, 2008 WL 5378232, *3 (D.S.C. Dec. 19, 2008); <u>Schultz v.</u>

<u>Braga</u>, 290 F.Supp.2d 637, 649 (D. Md. 2003)("the relevant factor in determining whether a

mistaken arrest is valid is ... whether the officers' mistake of identity was a reasonable one").

     Here, plaintiff Wright has provided the following facts to dispute defendants' arguments[9] that

---

[9]Defendants set forth various facts to show the steps officers took to locate Vinol Wilson, the person for whom they had an arrest warrant.  (<u>See</u> Facts Nos. 5 through 19 of Motion ... to Dismiss Count IV ... (doc #49) at 2-4)  The most significant facts used to justify the seizure of plaintiff Wright are the following:

     13.     Franklin showed the CS the 2005 Kansas driver's license photo of Wilson and CS stated that he had seen the person pictured, but did not know his name.  CS stated that he had seen Wilson wearing an orange-colored jersey with the number "23" on the back.  CS also said that Wilson had been seen with his hair in braids (or "corn-rows"), sporting a goatee, and with gold-colored teeth. ...

     * * *

     19.     ... CS called Franklin ... and informed Franklin that Wilson was on the gym basketball floor, shooting baskets before the start of his game, was wearing an orange-colored jersey with the number "23," and had his hair braided. ...

(Motion ... to Dismiss Count IV ... (doc #49) at 3 and 4)  The officers then seized a black male with braided hair, wearing an orange-colored jersey with the number "23" on it (plaintiff Wright).  (<u>See</u> Fact No. 24 of Motion ... to Dismiss Count IV ... (doc #49) at 5)

As for the post-arrest conduct of the officers, defendants set forth the following facts:

     27.     Franklin placed the man in handcuffs, sat him up, helped him to his feet, and escorted him out of the gym (and away from the large crowd in the gym).  On the way out of the gym, the man told Franklin "I'm not Vinol, you shot the wrong guy."  The man told Franklin his name was Stu Wright, a name that Franklin recognized from the

17

the officers reasonably believed that Wright was the person named in the warrant, that the officers

exercised due diligence to ascertain that the right person was being arrested and that the post-arrest

conduct of the officers was appropriate:

Declaration of Stuart Wright:

7. At some point, I do remember hearing the name Vinol mentioned and my saying that my name is Stuart Wright and that I had identification there in the gym.

* * *

15. I remember the man in the Royals shirt leaning over to say in my ear something to the effect of "What's your name?" I told him my name is Stuart Wright. He said, "Don't lie to me." I told him again that my name is Stuart Wright. ...

16. My brother Stephen Wright got them my driver's license from my gym bag and gave the license to one of the men who was there along with the man in the Royals shirt. My understanding is that this happened during the time that I was in their custody, shortly after they stood me up and were taking me out of the Grandview Community Center.

17. As I was being taken out of the Community Center, I saw a Grandview Police Officer named Officer Clausing. I recognized him as a Grandview High School graduate. I said something to the effect of, "My

_____

team roster for the 2008 Sunflower State games. ...

28. Another individual brought out Wright's gym bag and his identification was checked. It was discovered that Wright had two non-moving warrants out of Kansas City, Missouri. ...

29. Wright was asked if he needed any medical care, but he said that he did not. Wright was then permitted to leave with the advice that he resolve the two non-moving warrants. ...

30. The entire encounter from the time Franklin walked out on the basketball court until Wright left took approximately 15-20 minutes. ...

(Motion ... to Dismiss Count IV ... (doc #49) at 7-8)

name is Stuart Wright. I graduated from Grandview High School in 1996. You know me." Officer Clausing then said something to the general effect of, "That's not the guy. I know him." Nevertheless, I was taken out of the Grandview Community Center in handcuffs and put in the back of a car that was outside of the Community Center.

18. When they put me in the back seat of the car, they put me in there in such a way that my head was toward the passenger side and my feet were near the driver's side. By that time, many people had told them that I was Stuart Wright, they had my driver's license, and the Grandview Police Officer had told them that I was Stuart Wright and that he knew me. Still, they kept me handcuffed and in their custody.

19. While I was in their custody, they asked me questions about whether I played basketball with the man named Vinol, where the man named Vinol was, and how I could help them find the man named Vinol. I told them I did not know where he was or how to find him.

20. I remember hearing some of the men talking about taking a vacation day the next day, about how everything had happened so fast, about how hearing the "pop-pop" sounds, about how they had gotten the wrong guy.

21. I remember them laughing about it all.

22. At one point, my brother Stephen Wright was allowed to come over to the car and speak to me briefly.

23. Eventually, after 15 minutes or so in the car, the men pulled me out of the car. They told me that they were now going to pull the probes out of me. One of the men asked if I needed an ambulance. My brother told them that he was going to take me to the hospital (which he did). The man then said that he did not think I needed to go to the hospital because it was probably only a flesh wound. One of the men also told me that they were going to un-cuff me. He then said, "Now, you're not going to go all ape-shit on me, are you?" ...

*  *  *

26. They did not return my driver's license to me. I made several calls trying to get it back. They kept telling me that they had in fact given it to me. I told them that the license had never been returned to me. I left them cell phone numbers for my mother and my wife. Eventually, they did call my mother's phone and left a message that I could come and get my driver's

19

license back from them.  I did get the license back at the United States Courthouse in Kansas City, Kansas from the man who had been in the Royals shirt.

(doc #33-1)

Declaration of Brandon Rashad Jones:

8.      Stuart did say that he was Stuart Wright and not Vinol.  All of us nearby were telling them that Stuart was not Vinol.

9.      I saw Stuart get pulled into a position between the man in the Royals shirt and the man with the taser.  Then, I saw him get tasered and fall to the floor.

10.     I saw Stuart getting hand-cuffed and taken outside.

* * *

12.     I do know a man named Vinol Wilson.  At that time, Vinol was about 5'11" ... tall and weighed about 200 pounds.  He has gold caps on all of his teeth.  Stuart Wright was about 6'5" tall and weighed 280 pounds.

(doc #33-2)

Declaration of Stephen Leonard Wright:

8.      I did hear Stuart tell the men that he was not Vinol.  Almost everyone there was telling the men who Stuart Wright was and that he was not Vinol.

9.      I saw the man with the gun pull Stuart to a position in front of the man with a taser weapon.  I then heard the pop-pop of the taser, and I saw Stuart go down on the floor.

10.     I remember Stuart being taken outside and put into the back seat of a car.

11.     I went and got my brother Stuart's driver's license as soon as I could after I saw him get tasered and heard the name Vinol mentioned.  I took my brother Stuart's driver's license to the man in the Royals shirt.  This was very shortly after my brother had been taken out of the gym on the way to the car where they put him.

20

12.     The man in the Royals shirt told me that he knew my brother was not Vinol, but he said that my brother had information about Vinol. The man in the Royals shirt and one other man told me to speak to my brother and tell him to tell them what they want to hear. I went to the car and did say that to my brother. They continued to keep Stuart in custody.

13.     Stuart Wright was much bigger than Vinol Wilson – about 6 inches taller and about 75 to 80 pounds heavier. Also, Vinol Wilson is much darker in complexion that Stuart is. Vinol Wilson has some gold on most all, if not all, of the teeth in his mouth. Stuart does not have any gold on his teeth.

(doc #33-3)

Declaration of Walter Kenneth Bethea:

6.     I heard the name Vinol being mentioned. Basically everyone present was telling the men that the man they tasered and handcuffed was Stuart Wright, not Vinol Wilson.

7.     I recognized some of these men as the same ones who had come to my home earlier on April 15, 2010. However, none of them came to me for verification of identification regarding the man they had tasered, handcuffed, taken out of the gym, and put into a car.

(doc #33-4)

The facts provided by plaintiff and defendants bring into question whether the officers reasonably believed that plaintiff Wright was the person named in the warrant and whether the officers exercised due diligence to ascertain that the right person was being arrested. The seizure of plaintiff Wright appears to be based on a confidential source's review of a photograph of Vinol Wilson. This photograph of Vinol Wilson was obviously also available to the officers, yet they mistakenly seized plaintiff. While this photograph has not been made available to the Court to ascertain whether a reasonable person would mistake plaintiff Wright for Vinol Wilson, information which has been made available to the Court indicates that the height and weight differences between plaintiff and Vinol Wilson were significant, that Vinol Wilson was much darker in complexion than

21

plaintiff and that plaintiff had no gold on his teeth, while Vinol Wilson had "gold-colored teeth." In addition, the facts provided by plaintiff bring into question whether the officers reasonably believed that plaintiff was Vinol Wilson given that plaintiff and others present were stating, as the officers approached plaintiff, that plaintiff was not Vinol Wilson. The facts provided by plaintiff also bring into question whether the post-arrest conduct of the officers was appropriate as they allegedly continued to hold plaintiff in custody and question him even after they knew he was not Vinol Wilson.

As the application of qualified immunity often turns on the facts known by the officers at the time of the challenged conduct, the question of qualified immunity often cannot be resolved adequately until the dispositive facts have been presented at trial. See Brown v. Stewart, 910 F. Supp. 1064, 1071 (W.D. Pa. 1996). The Court finds that there is a genuine issue of material fact as to whether the arresting agents acted reasonably in arresting plaintiff and in their post-arrest conduct in continuing to hold and question plaintiff after they knew they had arrested the wrong man. Defendants Franklin and Wallace are not entitled to summary judgment on plaintiff's Bivens claim of false arrest and improper search and seizure.

### 2. Excessive Force

The Supreme Court has held that claims against law enforcement officers for the alleged use of excessive force during an arrest or other seizure should be analyzed under the Fourth Amendment's objective reasonableness standard and judged from the perspective of a reasonable officer on the scene of the incident. See Graham v. Connor, 490 U.S. 386, 395-96 (1989). The Eighth Circuit Court of Appeals provided further guidance in Howard v. Kansas City Police Department, 570 F.3d 984 (8th Cir. 2009), where the Court wrote:

22

In assessing the reasonableness of the Officers' conduct, we look at the totality of the circumstances and focus on factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." [Graham, 490 U.S. at 396.] ... Additionally, we must judge the reasonableness of the Officers' conduct from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and with "allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97 ....

570 F.3d at 989.

Defendants first argue that because defendant Wallace was the officer who tasered plaintiff, rather than defendant Franklin, defendant Franklin could only be held liable for his failure to intervene and not as a direct participant in the use of excessive force. (Motion ... to Dismiss Count IV ... (doc #49) at 21) Defendant Franklin states that he did not even notice that defendant Wallace had positioned himself behind plaintiff and drawn his taser. (See Fact No. 26 of Motion ... to Dismiss Count IV ... (doc #49) at 6)

The following facts have been provided by plaintiff with respect to defendant Franklin's participation in the alleged use of excessive force:

Declaration of Stuart Wright:

> 3.    Very suddenly, a man wearing a Kansas City Royals shirt came rushing toward me holding a gun in his right hand pointed at me. ... The first thing I saw was him being directly in front of me, rushing toward me with the gun pulled and out in his right hand and pointed at me.
>
> * * *
>
> 8.    I remember the man in the Royals shirt grabbing my shirt and kicking at my legs.
>
> * * *
>
> 14.    When he had hold of my shirt, he pulled me toward him.  At

23

that same time, he kicked at least one of my legs out from under me. The video shows that the man with the taser had been right there to the left of the man in the Royals shirt and the pulling of my shirt (and me) toward the ground and the kicking of my leg brought me directly in between the two men. It was right at that time that I then heard two shot-like sounds. I was tasered and injured for no reason in that I was doing nothing to injure anyone or to threaten anyone. The tasering was very painful. It felt like I was holding onto a power line. I fell to the floor.

(doc #33-1)

Declaration of Brandon Rashad Jones:

     3.     I remember seeing a man in a Kansas City Royals jersey running at my teammate Stuart Wright. The man had a gun in his right hand, and the gun was pointed at Stuart.

* * *

     9.     I saw Stuart get pulled into a position between the man in the Royals shirt and the man with the taser. Then, I saw him get tasered and fall to the floor.

(doc #33-2)

Declaration of Stephen Leonard Wright:

     3.     Very suddenly, a man wearing a Kansas City Royals shirt came rushing toward my brother, Stuart Wright, holding a gun in his right hand pointed at Stuart.

* * *

     9.     I saw the man with the gun pull Stuart to a position in front of the man with a taser weapon. I then heard the pop-pop of the taser, and I saw Stuart go down on the floor.

(doc #33-3)

Declaration of Walter Kenneth Bethea:

     4.     ... One of the men ran toward Stuart Wright with a gun in his right hand pointed at Stuart. ...

5.      I saw two men get Stuart in between them and than I heard and saw Stuart get tasered by the men.  Stuart then fell hard to the floor.

(doc #33-4)

As alleged by plaintiff, defendant Franklin had a gun pointed at plaintiff, pulled plaintiff between himself and defendant Wallace and held onto plaintiff as he was tasered.  These facts present a genuine issue of material fact that defendant Franklin directly participated in the use of excessive force.

Defendants next argue that it was objectively reasonable for defendant Wallace to deploy his taser gun for the following reasons:

Wallace reasonable believed that Wright in fact was Vinol Wilson who had a history of drug violence and crimes involving weapons and had an outstanding felon arrest warrant for drug trafficking.  Wilson was also believed to be a body builder who used steroids.  At the scene, Wright repeatedly refused to comply with Franklin's directive to get down on the floor and when Franklin reached out to grab Wright, [Wright] pushed his arm away.  Finally, just before the taser gun was deployed, it appeared that Franklin was cocking his arm to strike Franklin.

(Motion ... to Dismiss Count IV ... (doc #49) at 23)

As set forth above, the Court has determined that there are genuine issues of material fact as to whether the arresting agents could have reasonably believed that plaintiff Wright was Vinol Wilson and that plaintiff Wright was aggressive toward or resisting the officers.  Defendants Franklin and Wallace are not entitled to summary judgment on plaintiff's <u>Bivens</u> claim of excessive force.

### III.  PLAINTIFF'S ALTERNATIVE MOTION

In response to the Motion of the Individual Capacity Defendants to Dismiss Count IV of Plaintiff's First Amended Complaint or, in the Alternative, for Summary Judgment (doc #49), plaintiff filed Plaintiff's Suggestions in Opposition to Motion of the Individual Capacity Defendants

to Dismiss Count IV of Plaintiff's First Amended Complaint or, in the Alternative, for Summary Judgment [Doc. #49] and Plaintiff's Alternative Motion to (a) overrule and deny the Motion without prejudice, or (b) defer considering the Motion, or (c) allow time for discovery, or (d) issue any other appropriate order (doc #56).

As set forth above, the Court is denying in part defendants' motion to dismiss/summary judgment in that it has found that defendants Franklin and Wallace are not entitled to summary judgment on plaintiff's <u>Bivens</u> claims of false arrest, improper search and seizure and excessive force. Therefore, plaintiff's alternative motion is in effect granted in part with respect to defendants Franklin and Wallace. The Court is granting in part defendants' motion to dismiss/summary judgment in that defendants Clark and Bradley are entitled to a dismissal of plaintiff's <u>Bivens</u> claims of inadequate hiring, promotions, training, supervision, discipline and termination. The Court declines to grant plaintiff's alternative motion as it relates to these claims.

IV. <u>CONCLUSION</u>

Based on the foregoing, it is

ORDERED that the Motion of the Individual Capacity Defendants to Dismiss Count IV of Plaintiff's First Amended Complaint or, in the Alternative, for Summary Judgment (doc #49) is granted in part and denied in part. That portion of the motion seeking a dismissal of claims against defendants John Clark and Walter Bradley is granted. That portion of the motion seeking summary judgment as to plaintiff's claims against defendants Sean Franklin and Christopher Wallace is denied. It is further

ORDERED that Plaintiff's Alternative Motion (doc #56) is granted in part and denied in part. That portion of the motion seeking a denial of defendants' motion to dismiss/summary judgment is

granted to the extent that the Court has found that defendants Franklin and Wallace are not entitled to summary judgment on plaintiff's <u>Bivens</u> claims of false arrest, improper search and seizure and excessive force.  The remainder of the motion is denied.

_____/s/ Sarah W. Hays_____
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE

Case 4:10-cv-01220-SWH   Document 76   Filed 09/06/12   Page 27 of 27