IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| STUART WRIGHT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 10-01220-CV-W-SWH |
| ) | |
| UNITED STATES OF AMERICA, et al., ) | |
| ) | |
| Defendants. ) | |

ORDER

Pending before the Court is a remand of its Order denying the motion of defendant Deputy United States Marshals Sean Franklin and Christopher Wallace for summary judgment on Count IV of plaintiff's First Amended Complaint (doc #49). The Eighth Circuit Court of Appeals found that this Court failed to conduct a proper qualified immunity analysis as this Court merely noted the existence of disputed facts and summarily decided that qualified immunity was inapplicable. (Doc #82-1 at 4) This Court has been instructed to properly address defendants' qualified immunity defense and make findings of fact and conclusions of law sufficient to permit appellate review. (Id. at 2)

I. FINDINGS OF FACT

As instructed by the Eighth Circuit Court of Appeals in its remand judgment, "the district court must examine the record to determine which facts are genuinely disputed and view those facts in the light most favorable to the non-movant, 'as long as those facts are not so blatantly contradicted by the record … that no reasonable jury could believe [them].'" (Doc #82-1 at 4) The Court finds the following facts in the light most favorable to plaintiff Stuart Wright.

1.      In 2008, Vinol Wilson ("Wilson") was indicted by a Grand Jury in United States District Court for the District of Kansas for "conspiracy to manufacture, to possess with intent to distribute and to distribute cocaine base 'crack,' and to possess with intent to distribute and to distribute cocaine" in the case styled United States v. Vinol Wilson, 07-20168-07-JWL/DJW (D. Kan.).

2.      Following the issuance of the indictment, an arrest warrant was issued for Wilson; however, Wilson was not immediately located or apprehended.

3.      Franklin, a Deputy U.S. Marshal with the U.S. Marshals Service in the District of Kansas began an investigation to locate and arrest Wilson.

4.      Based upon his investigation, Franklin learned that Wilson had a history of drug, weapons, and aggravated assault offenses. Wilson had previously spent 78 months in prison for distributing crack cocaine and for using a firearm during a drug trafficking crime. Wilson was considered armed and dangerous.

5.      Based upon his investigation, Franklin also learned that Wilson was a black male, born in 1974, was into steroids, body building and dog fighting, and was known to play basketball with a group of acquaintances in leagues and tournaments in and around the Greater Kansas City area.

6.      For example, Franklin learned that Wilson played on a basketball team that participated in the 2008 Sunflower State games.

7.      After obtaining a copy of that particular team roster, Franklin undertook to talk with other team members in an effort to locate Wilson pursuant to the outstanding arrest warrant.

8.      Eventually, on Wednesday, April 15, 2009, at approximately 9:30 a.m., Franklin made contact with Walt Bethea ("Bethea"), who had played on Wilson's basketball team.

9.      Franklin showed Bethea a 2005 Kansas driver's license photo of Wilson that Bethea identified as "V" and Bethea stated that he knew Wilson was wanted by law enforcement for some drug charges.

10.     Bethea also informed Franklin that Wilson played in an adult basketball league in Grandview, Missouri, on Wednesday evenings at the Grandview Community Center. Bethea said that Wilson had played in the prior week's game and was scheduled to play again that evening at 7:30 p.m.

11.     Bethea stated that Wilson's team was comprised of all black males who wore orange-colored jerseys.

12. At approximately 11:30 a.m., on April 15, 2009, Franklin met with a confidential source ("CS") at the Grandview Community Center.

13. Franklin showed CS the 2005 Kansas driver's license photo of Wilson and CS stated that he had seen the person pictured, but did not know his name. CS stated that he had seen Wilson wearing an orange-colored jersey with the number "23" on the back. CS also said that Wilson had been seen with his hair in braids (or "corn-rows"), sporting a goatee, and with gold-colored teeth.

14. CS obtained access to the roster for the team that he identified as the one Wilson played for. CS explained that individuals playing in the league do not have to produce any identification and rosters are not checked by the Grandview Community Center for any accuracy. The roster included many of the names that had been on the team roster for the 2008 Sunflower State games, including Walt Bethea. Wilson's name was not listed, but there was an entry for "Vyshon Watson." Franklin knew that Wilson had a minor son named Vyshon.

15. CS told Franklin that he would assist in identifying Wilson if he showed up for the basketball game scheduled for that evening.

16. At 5:55 p.m., Franklin received a telephone call from a friend of Bethea's advising him that the basketball game involving Wilson's team had been moved up to 6:30 p.m. Franklin then placed a call to CS to verify the information.

17. At around this same time, Franklin set up a briefing area near the parking lot for Grandview High School to organize the arrest team and the operation to arrest Wilson.

18. At approximately 6:15 p.m., CS called Franklin and confirmed that the game involving Wilson's team had been moved up an hour and was due to start at 6:30 p.m. CS advised Franklin that Wilson had been seen inside the gym.

19. A few minutes later, CS called Franklin again and informed Franklin that Wilson was on the gym basketball floor, shooting baskets before the start of his game, was wearing an orange-colored jersey with the number "23," and had his hair braided.

20. At 6:45 p.m., Franklin arrived at the Grandview Community Center along with five other Deputy U.S. Marshals ("DUSMs"), including Wallace.

21. Franklin made the decision to arrest Wilson during the course of the basketball game because he felt that this offered the greatest protection for the safety of the public and law enforcement. The Grandview Community Center parking lot was crowded with cars and people (including young people) and Franklin believed it might pose an undue public danger to try to apprehend Wilson

3

as he was leaving the Community Center. Franklin also wanted to avoid any high speed vehicle chase. In addition, Franklin felt that by arresting Wilson on the basketball court while a game was in progress, he was somewhat less likely to have a weapon on him.

22. Franklin, Wallace, and the three other DUSMs proceeded to the basketball gym where Franklin showed his badge to the individual running the clock/scoreboard. Franklin told the individual to sound the buzzer and stop the game.

23. Franklin was wearing his U.S. Marshals Service badge on a chain around his neck.

24. After the buzzer sounded, Franklin and Wallace went out on to the basketball court toward a black male with braided hair, wearing an orange-colored jersey with the number "23" on it.

25. Stuart Wright, a black male wearing an orange-colored number "23" jersey, was playing a full-court game of basketball when very suddenly, Wright saw a man wearing a Kansas City Royals shirt directly in front of him with a gun pointed at him. The man (Franklin) was not wearing a uniform of any type that Wright was able to recognize. Wright did not see anything identifying the man as a law enforcement officer. The man was yelling things as he came toward Wright, but Wright could not understand what he was saying. At some point, Wright heard the name Vinol mentioned. Wright told the man his name and said that he had identification there in the gym.

26. Wright never threatened Franklin by any words he said or anything he did. Wright did not push Franklin's arm away and did not take a stance and cock his arm like he was about to throw a punch at Franklin. Wright did not attempt to run away from Franklin. Wright merely backed away from a man in a Royals shirt who had a gun aimed at him.[1]

---

[1] The Court acknowledges that these findings are at odds with defendants' version of the incident:

> Franklin drew his service weapon and began yelling "Police—U.S. Marshal, get on the ground Vinol." The man refused to get down and kept backing away from Franklin. Franklin kept yelling and the man said "I'm not the one you want." Franklin again yelled for the man to get down, but he kept backing away. Franklin reached out with his arm and tried to grab the man, but he pushed Franklin's arm away, took a stance, and cocked his arm like he was about to throw a punch at Franklin.

(Doc #49 at 5 ¶ 25) This Court's findings are also at odds with the following statement from the

4

27. Franklin grabbed Wright's shirt and kicked at his legs. The pulling of Wright and the kicking of Wright's leg brought Wright directly in between Franklin and Wallace. Wallace deployed his taser hitting Wright in the back and Wright fell to the floor.

28. Franklin leaned over Wright to say in his ear something to the effect of, "What's your name?" Wright told Franklin he name was Stuart Wright, a name that Franklin recognized from the team roster for the 2008 Sunflower State games. Franklin said, "Don't lie to me." Wright told Franklin again that his name was Stuart Wright. Franklin then said something to the effect of, "Let's get him out of here." Wright was then pulled to his feet and handcuffed. Many of the people present were telling the men that Stuart Wright was not Vinol Wilson.

29. As Wright was being taken out of the Community Center, he saw a Grandview Police Officer named Officer Clausing. Wright recognized him as a Grandview High School graduate. Wright said something to the effect of, "My name is Stuart Wright. I graduated from Grandview High School in 1996. You know me." Officer Clausing then said something to the general effect of, "That's not the guy. I know him." Nevertheless, Wright was taken out of the Community Center in handcuffs and put in the back of a car that was outside the Community Center.

30. Stuart Wright's brother, Stephen Wright, got Stuart's driver's license from his gym bag and gave the license to Franklin very shortly after Stuart

---

Eighth Circuit Court of Appeals' remand judgment:

> A video of the arrest confirms that Wright did not drop to the floor as ordered by the Marshals and instead, retreated, attempted to evade the officers, and physically resisted their attempts to take him into custody.

(Doc #82-1 at 4) This Court has repeatedly viewed the video of the arrest and cannot make a finding that Wright "pushed Franklin's arm away, took a stance, and cocked his arm like he was about to throw a punch at Franklin" nor that Wright "retreated, attempted to evade the officers, and physically resisted their attempts to take him into custody." Rather, the video shows a five-second interval where Wright (who is running down the basketball court engaged in a game of basketball) sees a man wearing a Kansas City Royals shirt with a gun pointed at him to where Wright is lying on the floor after being shot in the back with a taser. While the video does show Wright backing away from the man with the gun, there does not appear to be anything confrontational in Wright's actions. The video does not support any indication that Wright would have recognized the man as a law enforcement officer, let alone attempted to evade an officer or physically resisted an officer's attempts to take him into custody. The video supports Wright's assertions that he was bewildered by a man on the basketball court with a gun pointed at him and that he backed up a few steps.

5

had been taken out of the gym.  Franklin told Stephen Wright that he knew his brother was not Vinol, but Franklin said that Stuart had information about Vinol.  Franklin and one other man told Stephen to speak to his brother and tell him to tell them what they wanted to hear.

31.     Stephen Wright was allowed to speak to Stuart briefly in the car.  Stephen told Stuart to give the officers any information he had about Vinol.  The officers continued to keep Stuart in custody.

32.     The officers asked Stuart Wright questions about whether he played basketball with a man named Vinol Wilson, where Vinol Wilson was, and how Wright could help them find Vinol Wilson.  Wright told the men he did not know where Vinol Wilson was or how to find him.

33.     Wright heard some of the men talking about taking a vacation day the next day, about how everything had happened so fast, about hearing the "pop-pop" sounds, and about how they had gotten the wrong guy.  Wright heard the men laughing about it all.

34.     After fifteen minutes or so in the car, the men pulled Stuart Wright out of the car.  They told him that they were going to pull the probes out of him.  One of the men asked if he needed an ambulance.  Stephen Wright told them that he was going to take Stuart to the hospital (which he did).  The man then said that he did not think Stuart needed to go to the hospital because it was probably only a flesh wound.  One of the men also told Stuart that they were going to un-cuff him.  He then said, "Now, you're not going to go all ape-shit on me, are you?"  Stuart told him, "No."

35.     Franklin told Stuart Wright that he had checked him in the computer and that he had two traffic warrants that he needed to handle.

36.     The men did not return Wright's driver's license to him.  Wright made several calls trying to get it back.  They kept telling him that they had in fact given it to him.  Wright told them that the license had never been returned to him.  Wright left them cell phone numbers for his mother and his wife. Eventually, someone did call his mother's phone and left a message that Wright could come and get his driver's license back.  Wright did get the license back at the United States Courthouse in Kansas City, Kansas from Franklin.

37.     At the time in question, Vinol Wilson was about 5'11" tall and weighed about 200 pounds.  He had gold caps on all of his teeth.  Stuart Wright was about 6'5" tall and weighed 280 pounds.

## II. CONCLUSIONS OF LAW

With the dismissal of the claims for supervisory liability against defendants Clark and Bradley,[2] the claims remaining in Count IV of the First Amended Complaint consist of unreasonable search and seizure, excessive force and false arrest against defendants Franklin and Wallace. Defendants Franklin and Wallace contend that summary judgment[3] must be entered on these <u>Bivens</u> claims because they are protected by qualified immunity. Specifically, defendants argue:

> Franklin and Wallace are ... entitled to qualified immunity in this case. Although Wright's First Amended Complaint does not identify any particular actions taken by Franklin and Wallace, it is conceded that Franklin and Wallace had direct participation in the activities that form the basis of Wright's <u>Bivens</u> claims. Nonetheless, Franklin and Wallace are entitled to qualified immunity because the actions undertaken by them on April 15, 2009, did not violate Wright's constitutional rights – the first requirement that Wright must establish to avoid the application of qualified immunity.

(Motion ... for Summary Judgment (doc #49) at 15)

Both plaintiff and defendants agree that the proper test used to determine whether the doctrine of qualified immunity applies was set forth by the Eighth Circuit Court of Appeals in <u>Howard v. Kansas City Police Department</u>, 570 F.3d 984 (8th Cir. 2009). (<u>See</u> Motion ... for Summary Judgment (doc #49) at 11; Plaintiff's Suggestions in Opposition to Motion ... for

---

[2] <u>See</u> doc #76.
[3] Pursuant to Federal Rule of Civil Procedure 56, summary judgment is granted when the pleadings and evidence show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to show the absence of evidence to support the nonmoving party's case. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). The nonmoving party may not rest upon allegations or general denials, but must come forward with specific facts to prove that a genuine issue for trial exists. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). The Court must review the facts in the light most favorable to the party opposing the motion for summary judgment and give that party the benefit of any inferences that logically can be drawn from those facts. <u>See</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970).

Summary Judgment (doc #56) at 19) The Howard court wrote:

> "Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." ... To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.

Howard, 570 F.3d at 987-88 (citations omitted). Accord Baribeau v. City of Minneapolis, 596 F.3d 465, 473-74 (8th Cir. 2010).

In their original motion, defendants Franklin and Wallace advised that they were only arguing that the facts did not demonstrate the deprivation of any constitutional rights. They were not arguing that the rights were not clearly established at the time of the alleged deprivations. (See Motion ... for Summary Judgment (doc #49) at 11 n.3)

    A.    False Arrest

According to defendants, defendant Franklin properly arrested and detained plaintiff Wright for resisting arrest as "Franklin had sufficient grounds to arrest Wright after he refused to comply with a directive to get down on the ground, when Wright evaded Franklin by backing away, and when Wright threatened to use physical violence against Franklin." (Motion ... for Summary Judgment (doc #49) at 15) Therefore, there was no constitutional violation by defendant Franklin. (Id.) In the alternative, defendants argue that "Franklin's actions in arresting Wright based on mistaken identity ... did not violate the Constitution" under the Supreme Court decision in Hill v. California, 401 U.S. 797 (1971). (Id. at 16) As for defendant Wallace, defendants assert "Wallace did not arrest Wright and, thus, is entitled to qualified immunity on any false arrest constitutional claim because he did not directly participate in the alleged violation." (Id. at 16 n.5)

First, the premise underlying defendants' argument with respect to defendant Wallace is simply wrong. As set forth by the Missouri Supreme Court, "all persons who directly procure, aid, abet, or assist in an unlawful imprisonment are liable as principals." Rustici v. Weidemeyer, 673 S.W.2d 762, 768 (Mo. 1984)(quoting Parrish v. Herron, 225 S.W.2d 391, 399 (Mo. Ct. App. 1949)). As set forth above, Wallace participated in the arrest team and deployed his taser, bringing plaintiff Wright to the ground where Wright was then handcuffed. (See Fact Nos. 22, 24, 27 and 28, supra) The Court finds that defendant Wallace aided, abetted and assisted in the arrest of plaintiff. Contrary to defendants' argument, defendant Wallace directly participated in the alleged violation.

The "facts"[4] which form the core of defendants' argument that defendant Franklin had sufficient grounds to arrest plaintiff for resisting arrest are not the facts as found above by the

---

[4] Defendants set forth the following in support of their argument that plaintiff was resisting arrest:

> 25. Franklin drew his service weapon and began yelling "Police–U.S. Marshal, get on the ground Vinol." The man refused to get down and kept backing away from Franklin. Franklin kept yelling and the man said "I'm not the one you want." Franklin again yelled for the man to get down, but he kept backing away. Franklin reached out with his arm and tried to grab the man, but he pushed Franklin's arm away, took a stance, and cocked his arm like he was about to throw a punch at Franklin. Franklin Declaration ¶ 29; Wallace Declaration ¶¶ 15-16.
>
> * * *
>
> 31. After pushing away Franklin's arm, the man in the "23" jersey cocked his arm to a fighting position. Franklin Declaration ¶ 30; Wallace Declaration ¶ 12.
>
> 32. Wallace, at that point standing behind the player, was concerned that the man was disobeying direct orders to get on the ground and appeared to be preparing to strike Franklin. Wallace Declaration ¶ 17.

(Motion ... for Summary Judgment (doc #49) at 5 and 7)

Court. Rather, the Court found:

> Wright never threatened Franklin by any words he said or anything he did. Wright did not push Franklin's arm away and did not take a stance and cock his arm like he was about to throw a punch at Franklin. Wright did not attempt to run away from Franklin. Wright merely backed away from a man in a Royals shirt who had a gun aimed at him.

(See Fact No. 26, supra) Further, the Court found that "[t]he video does not support any indication that Wright would have recognized the man as a law enforcement officer, let alone attempted to evade an officer or physically resisted an officer's attempts to take him into custody." (See Fact No. 26 at n.1) Thus, the Court cannot find that defendants were justified in arresting plaintiff for resisting arrest.

However, defendants' argument that "Franklin's actions in arresting Wright based on mistaken identity ... did not violate the Constitution" under the Supreme Court decision in Hill v. California, 401 U.S. 797 (1971), is more compelling. The Hill case was not a civil case brought by the victim of a mistaken identity arrest, but was instead a suppression issue brought by the criminal defendant when his apartment was searched and evidence was seized after the arrest of a person who matched the defendant's physical description and who was found in the defendant's apartment. The Hill court found that the officers reasonably believed the person they arrested was defendant Hill, the person for whom they had probable cause to arrest, and that the actions the officers took after the arrest were, likewise, reasonable. Id. at 803-05. Some courts, as cited by defendants, have expanded the analysis in Hill to include civil suits for mistaken identity. In these cases, the issue to be decided was whether a reasonable officer could have believed that the plaintiff was the person named in the warrant. See Moore v. McMullen, 152 F.3d 927, *2 (9th Cir. 1998)("In addition, the officer must prove that he exercised due diligence to ascertain that the right person is being arrested."); Sumpter v. United States, 2008 WL 5378232, *3 (D.S.C. Dec. 19,

2008); Schultz v. Braga, 290 F.Supp.2d 637, 649 (D. Md. 2003)("the relevant factor in determining whether a mistaken arrest is valid is ... whether the officers' mistake of identity was a reasonable one").

Given the steps officers took to locate Vinol Wilson, the person for whom they had an arrest warrant, which facts are set forth above at Fact Nos. 5 through 19, the Court finds that the officers' mistake in identity as they ran onto the basketball court was an understandable mistake and the arrest of the person wearing the number "23" jersey was a reasonable response to the situation facing them at the time. These facts do not demonstrate the deprivation of a constitutional or statutory right. Therefore, defendants Franklin and Wallace are entitled to summary judgment on plaintiff's claim of false arrest.

B.  Excessive Force

The Supreme Court has held that claims against law enforcement officers for the alleged use of excessive force during an arrest or other seizure should be analyzed under the Fourth Amendment's objective reasonableness standard and judged from the perspective of a reasonable officer on the scene of the incident. See Plumhoff v. Rickard, 134 S.Ct. 2012, 2020 (2014); Graham v. Connor, 490 U.S. 386, 395-96 (1989). The Eighth Circuit Court of Appeals provided further guidance in Howard v. Kansas City Police Department, 570 F.3d 984 (8th Cir. 2009), where the Court wrote:

> In assessing the reasonableness of the Officers' conduct, we look at the totality of the circumstances and focus on factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." [Graham, 490 U.S. at 396.] ... Additionally, we must judge the reasonableness of the Officers' conduct from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and with "allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about

11

the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97 ....

570 F.3d at 989.

Defendants first argue that because defendant Wallace was the officer who tasered plaintiff, rather than defendant Franklin, defendant Franklin could only be held liable for his failure to intervene and not as a direct participant in the use of excessive force. (Motion ... for Summary Judgment (doc #49) at 21) The facts as found above by the Court are that defendant Franklin had a gun pointed at plaintiff, pulled plaintiff between himself and defendant Wallace and held onto plaintiff as he was tasered. (See Fact Nos. 25 and 27, supra) The Court finds these facts sufficient for a finding that defendant Franklin directly participated in the use of excessive force.

Defendants next argue that it was objectively reasonable for defendant Wallace to deploy his taser gun for the following reasons:

> Wallace reasonable believed that Wright in fact was Vinol Wilson who had a history of drug violence and crimes involving weapons and had an outstanding felon arrest warrant for drug trafficking. Wilson was also believed to be a body builder who used steroids. At the scene, Wright repeatedly refused to comply with Franklin's directive to get down on the floor and when Franklin reached out to grab Wright, [Wright] pushed his arm away. Finally, just before the taser gun was deployed, it appeared that Franklin was cocking his arm to strike Franklin.

(Motion ... to Dismiss Count IV ... (doc #49) at 23)

Again, the "facts" which form the core of defendants' argument that the arresting officers could have reasonably believed that plaintiff Wright was aggressive toward or resisting the officers are not the facts as found above by the Court. Rather, the Court found:

> Wright never threatened Franklin by any words he said or anything he did. Wright did not push Franklin's arm away and did not take a stance and cock his arm like he was about to throw a punch at Franklin. Wright did not attempt to run away from Franklin. Wright merely backed away from a man in a Royals shirt who had

12

a gun aimed at him.

(See Fact No. 26, supra) Further, the Court found that "[t]he video does not support any indication that Wright would have recognized the man as a law enforcement officer, let alone attempted to evade an officer or physically resisted an officer's attempts to take him into custody." (See Fact No. 26 at n.1) Thus, the Court cannot find that defendants were justified in the force they used. A reasonable officer on the scene would not have believed it necessary to use a taser where the man the officers believed to be Vinol Wilson merely backed away from a man holding a gun on him. See Shekleton v. Eichenberger, 677 F.3d 361, 366 (8th Cir. 2012)(plaintiff "established that a violation of a constitutional right occurred in that a reasonable officer would not have deployed his taser under the circumstances [of an unarmed suspected misdemeanant,[5] who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him]").

Having determined that plaintiff Wright has established that a violation of a constitutional right occurred, the case law would next require that the Court determine whether defendants' use of force against Wright constituted a clearly established constitutional violation. However, as set forth above, defendants did not initially argue that the right to be free from excessive force was not clearly established at the time of the alleged deprivation. (See Motion … for Summary Judgment (doc #49) at 11 n.3) Even so, as set forth in Shekleton, "the right to be free from excessive force

---

[5]This Court acknowledges that defendants believed Vinol Wilson, a suspected felon, to be an individual who might resist arrest. However, even given defendants' preconceived assumptions that the arrest of Wilson might prove dangerous or difficult, the officers were not justified in immediately tasering the man they believed to be Wilson when the man could not reasonably have been perceived as being aggressive or resisting arrest. See Taylor v. Prince George's County, 2014 WL 2964093, *6 (D. Md. June 30, 2014)("Defendant's assertion that Anthony Ford [person for whom officer had warrant] previously fled from the police when they conducted surveillance of his home would not justify applying force when the suspect shows no resistance, as Plaintiff [mistakenly identified as Anthony Ford] argues here.")

dates back to the adoption of the Bill of Rights of our Constitution" and these "general constitutional principles against excessive force that were clearly established at the time of the incident … were such as to put a reasonable officer on notice that tasering [of an unarmed suspected misdemeanant,[6] who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him,] was excessive force in violation of the clearly established law." Shekleton v. Eichenberger, 677 F.3d 361, 367 (8th Cir. 2012). Defendants Franklin and Wallace are not entitled to summary judgment on plaintiff's Bivens claim of excessive force.

C. Improper Search and Seizure

Next, defendants argue "[i]nasmuch as Wright's arrest was constitutional, [the] post-arrest conduct [of handcuffing Wright, taking him outside the gym, checking his identification, running a search for outstanding warrants and then releasing Wright from custody after approximately 15 to 20 minutes] likewise did not violate the Fourth Amendment." (Motion … for Summary Judgment (doc #49) at 20) As for defendant Wallace, defendants assert "Wallace was not involved in the search and seizure of Wright and, thus, is entitled to qualified immunity on any [improper search and seizure] constitutional claim because he did not directly participate in the alleged violation."[7] (Id. at 20 n.7)

---

[6]Regardless of the crime Vinol Wilson was suspected of committing, the fact remains that defendants tasered an unarmed man, who did not resist arrest, did not threaten the officers, did not attempt to run from them, and did not behave aggressively towards them.

[7]Again, the premise underlying defendants' argument with respect to defendant Wallace is simply wrong. As set forth by the Missouri Supreme Court, "all persons who directly procure, aid, abet, or assist in an unlawful imprisonment are liable as principals." Rustici v. Weidemeyer, 673 S.W.2d 762, 768 (Mo. 1984)(quoting Parrish v. Herron, 225 S.W.2d 391, 399 (Mo. Ct. App. 1949)). As set forth above, Wallace participated in the arrest team and deployed his taser, bringing plaintiff Wright to the ground where Wright was then handcuffed. (See Fact Nos. 22, 24, 27 and 28, supra) The Court finds that defendant Wallace aided, abetted and assisted in any

14

The Court understands plaintiff's complaint as alleging a violation of his liberty interest when he was detained after defendants knew that he was not Vinol Wilson. The "facts" presented by defendants, i.e. the post-arrest conduct of handcuffing Wright, taking him outside the gym, checking his identification, running a search for outstanding warrants and then releasing Wright from custody after approximately 15 to 20 minutes, are not the pertinent facts as found by the Court. The facts which the Court finds pertinent to plaintiff's improper search and seizure claim are the following:

> 29. As Wright was being taken out of the Community Center, he saw a Grandview Police Officer named Officer Clausing. Wright recognized him as a Grandview High School graduate. Wright said something to the effect of, "My name is Stuart Wright. I graduated from Grandview High School in 1996. You know me." Officer Clausing then said something to the general effect of, "That's not the guy. I know him." Nevertheless, Wright was taken out of the Community Center in handcuffs and put in the back of a car that was outside the Community Center.

> 30. Stuart Wright's brother, Stephen Wright, got Stuart's driver's license from his gym bag and gave the license to Franklin very shortly after Stuart had been taken out of the gym. Franklin told Stephen Wright that he knew his brother was not Vinol, but Franklin said that Stuart had information about Vinol. Franklin and one other man told Stephen to speak to his brother and tell him to tell them what they wanted to hear.

> 31. Stephen Wright was allowed to speak to Stuart briefly in the car. Stephen told Stuart to give the officers any information he had about Vinol. The officers continued to keep Stuart in custody.

> 32. The officers asked Stuart Wright questions about whether he played basketball with a man named Vinol Wilson, where Vinol Wilson was, and how Wright could help them find Vinol Wilson. Wright told the men he did not know where Vinol Wilson was or how to find him.

> 33. Wright heard some of the men talking about taking a vacation day the next day, about how everything had happened so fast, about hearing the "pop-pop" sounds, and about how they had gotten the wrong guy. Wright heard

---

unlawful imprisonment or seizure of plaintiff. Contrary to defendants' argument, defendant Wallace directly participated in the alleged violation.

the men laughing about it all.

      34.    After fifteen minutes or so in the car, the men pulled Stuart Wright out of the car. They told him that they were going to pull the probes out of him. One of the men asked if he needed an ambulance. Stephen Wright told them that he was going to take Stuart to the hospital (which he did). The man then said that he did not think Stuart needed to go to the hospital because it was probably only a flesh wound. One of the men also told Stuart that they were going to un-cuff him. He then said, "Now, you're not going to go all ape-shit on me, are you?" Stuart told him, "No."

* * *

      36.    The men did not return Wright's driver's license to him. Wright made several calls trying to get it back. They kept telling him that they had in fact given it to him. Wright told them that the license had never been returned to him. Wright left them cell phone numbers for his mother and his wife. Eventually, someone did call his mother's phone and left a message that Wright could come and get his driver's license back. Wright did get the license back at the United States Courthouse in Kansas City, Kansas from Franklin.

These facts demonstrate that the post-arrest conduct of the officers was inappropriate as they continued to hold plaintiff in custody and question him even after they knew he was not Vinol Wilson. See Davis v. Hall, 375 F.3d 703, 714 (8th Cir. 2004)(citing Sanders v. English, 950 F.2d 1152 (5th Cir. 1992)(for the proposition that "failure to release after officer knew … that plaintiff had been misidentified gives rise to cause of action under § 1983")). Further, the Court finds that these facts demonstrate that plaintiff was not treated with the respect and deference one would expect would be forthcoming after one was subjected to the pain and indignities to which plaintiff had been mistakenly subjected by the officers. See Davis v. Hall, 375 F.3d 703, 713 (8th Cir. 2004)(citing Young v. City of Little Rock, 249 F.3d 730 (8th Cir. 2001)(for the proposition that 30-minute detention and strip search of plaintiff (following judge's order of release of plaintiff who had been misidentified) showed a process of administrative foot-dragging, characterized by gross indignities)).

While defendants would have the Court find that a mere twenty minutes of being held in custody does not amount to a Constitutional violation when others have been unlawfully held in custody for hours and days, the Court notes the difference is that in those cases cited by defendants, the persons unlawfully held appear to have been released as soon as the officers realized a mistake had been made. See Baker v. McCollan, 443 U.S. 137, 141 (1979)("when officials compared his appearance against a file photograph of the wanted man and, recognizing their error, released him"); Lane v. Sarpy County, 165 F.3d 623, 624 (8th Cir. 1999)("defendants mistakenly arrested and detained plaintiff for approximately six hours, believing him to be a different individual with the same name"). In this case, defendant did not release plaintiff Wright as soon as they realized they had made a mistake. Instead, the officers attempted to capitalize on their mistake by subjecting plaintiff Wright to interrogation.

As set forth in Taylor v. Prince George's County, 2014 WL 2964093 (D. Md. June 30, 2014), this type of conduct violates a person's Fourth Amendment right to be secure against unreasonable searches and seizures. In Taylor, the plaintiff was mistakenly identified by officers as Anthony Ford, a person suspected of murder. Plaintiff Taylor was pulled from his car at gunpoint by officers, told to get on the ground, and patted down for weapons. Id. at *2. The defendant detective stated that after plaintiff was on the ground, he looked at his face and noticed that he was not Anthony Ford, so he asked plaintiff to stand up. Id. at *3. The defendant detective then questioned plaintiff Taylor. Id. In discussing plaintiff's Taylor Section 1983 claim for arrest without probable cause, the court stated:

> … Plaintiff acknowledges that "the police in this case certainly had the right to approach Mr. Taylor and to question him and even to pat down his outer clothing for weapons for their safety given their suspicion that he might have been Anthony Ford. … Plaintiff argues, however, that "any further justification for [the detectives'] decision to continue to hold Mr. Taylor and to question him vanished

17

> after they determined that he was *not* Anthony Ford." … Detective Woodside asserts that Plaintiff was detained even after he determined that Mr. Taylor was not the murder suspect for purposes of investigating whether he had any connection to Anthony Ford. Thus, the issue is whether Plaintiff's encounter with Detective Woodside after it was determined that he was not Anthony Ford constituted a seizure governed by the Fourth Amendment.
>
> * * *
>
> … Plaintiff's interaction with Detective Woodside after it was determined that he was not Anthony Ford is akin to an "investigatory detention" under *Terry*, which requires reasonable articulable suspicion that a crime had been or was about to be committed. …
>
> Detective Woodside argues that "[t]he questioning of Taylor to determine whether there was any connection between him and Ford was reasonable given all the information and conclusions reached by the officers." … In the reply brief, Defendant contends that "[t]he detention was legally justified by Woodside's belief that Ford was driving Taylor's vehicle when he fled from police the day before the incident and the apartment manager's identification of Ford as a person seen at Taylor's apartment." … Although these events may have justified mistaking Plaintiff for Anthony Ford, once Detective Woodside realized that Plaintiff was not, in fact, Anthony Ford, further detention required consent or reasonable articulable suspicion. … But absent consent or reasonable articulable suspicion of criminal activity by *Mr. Taylor* after Detective Woodside confirmed the mistaken identity, Detective Woodside could not detain an individual who turned out *not* to be the murder suspect in an effort to further his investigation as to Anthony Ford.

Taylor, 2014 WL 2964093 at *7 and 9. As in the Taylor case, after Detectives Franklin and Wallace realized that plaintiff Wright was not, in fact, Vinol Wilson, they could not constitutionally detain Wright in an effort to further their investigation as to Wilson.

Having determined that plaintiff Wright has established that a violation of a constitutional right occurred, the case law would next require that the Court determine whether defendants' continued detention of Wright after they knew he was not Vinol Wilson constituted a clearly established constitutional violation. Again, as set forth above, defendants did not initially argue that the right was not clearly established at the time of the alleged deprivation. (See Motion … for Summary Judgment (doc #49) at 11 n.3) Even so, as set forth in Davis v. Hall, 375 F.3d 703, 719

18

(8th Cir. 2004), a constitutional right is clearly established when it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. The Davis court cited with approval the case of Sivard v. Pulaski County, 959 F.2d 662 (7th Cir. 1992), for the proposition that "continued detention where sheriff knew it was wrongful states claim under § 1983 for due process violation." See also Taylor v. Prince George's County, 2014 WL 2964093, *10 (D. Md. June 30, 2014)("Detective Woodside continued to detain Plaintiff even after he determined that Mr. Taylor was not the murder suspect. The right to be free from detention absent consent or reasonable articulable suspicion was clearly established at the time of the events at issue here.") A reasonable officer would have known that a person arrested because of a mistaken identity should be immediately released upon discovery of the mistake, rather than engaging in harassing behavior towards the person. Defendants Franklin and Wallace are not entitled to summary judgment on plaintiff's Bivens claim of improper search and seizure.

### III. PLAINTIFF'S ALTERNATIVE MOTION

Plaintiff has re-filed Plaintiff's Alternative Motion to (#1) overrule and deny the [S.J.] Motion without prejudice, or (#2) defer considering the [S.J.] Motion and allow time for discovery, or (#3) issue any other appropriate order (doc #96).

As set forth above, the Court is denying in part defendants' motion for summary judgment in that it has found that defendants Franklin and Wallace are not entitled to summary judgment on plaintiff's Bivens claims of excessive force and improper search and seizure. Therefore, plaintiff's alternative motion is in effect granted in part.

IV. CONCLUSION

Based on the foregoing, it is

ORDERED that the Motion … for Summary Judgment (doc #49) as remanded is granted in part and denied in part. That portion of the motion seeking summary judgment as to plaintiff's claim against defendants Sean Franklin and Christopher Wallace for false arrest is granted. That portion of the motion seeking summary judgment as to plaintiff's claims against defendants Sean Franklin and Christopher Wallace for excessive force and improper search and seizure is denied. It is further

ORDERED that Plaintiff's Alternative Motion (doc #96) is granted in part and denied in part. That portion of the motion seeking a denial of defendants' motion for summary judgment is granted to the extent that the Court has found that defendants Franklin and Wallace are not entitled to summary judgment on plaintiff's Bivens claims of excessive force and improper search and seizure. The remainder of the motion is denied.

*/s/ Sarah W. Hays*
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE